## IN THE U.S. DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ERIN MAURAD** <br> 4660 Martin Luther King Jr. Avenue SW <br> Apt B107 <br> Washington, DC 20032 <br><br> **Plaintiff,** <br><br> v. <br><br> **BLUE SKYE CONSTRUCTION, LLC** <br> 1204 Fairmont Street, N.W. <br> Washington, DC 20009 <br><br> **BRYAN "SCOTTIE" IRVING** <br> 1204 Fairmont St., NW <br> Washington, DC 20009 <br><br> **MARK BARGAS** <br> 10727 Easterday Rd <br> Myersville, MD 21773 <br><br> **Defendants.** | Civil Action No. 19-3116 |

## **COMPLAINT**

COMES NOW Plaintiff Erin Maurad, by and through her undersigned counsel, and complains of the Defendants as follows:

## **NATURE OF THE ACTION**

1. Plaintiff Erin Maurad (hereinafter, "Plaintiff" or "Ms. Maurad") is a female resident of the District of Columbia. Plaintiff brings this action against the Defendants for violating her rights under the Title VII of the Civil Rights Act of 1964, as amended, 42 USC § 2000e, *et seq.*, and the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01, *et seq.*

2. Ms. Maurad is an Assistant Project Manager for Defendant Blue Sky Construction (hereinafter "BSC"). During her tenure at BSC, Ms. Maurad has been subjected to repeated sexual harassment, gender based harassment for not conforming to gender stereotypes, and retaliation.

## PARTIES

3. Defendant Blue Skye Construction, is a construction company and private employer headquartered in Washington, DC. Defendant BSC'S registered agent is listed as Bryan "Scottie" Irving, who is also BSC's Chief Executive Officer and a defendant in this action. Defendant BSC receives city funds from the District of Columbia government to construct various projects within the District. Upon information and belief, Blue Skye Construction is selected as a contractor for several D.C. government funded projects based on Defendant Irving's close relationship with D.C. Mayor Muriel Bowser.

4. Defendant Bryan "Scottie" Irving (hereinafter Defendant "Irving") is BSC's Chief Executive Officer and owner. Defendant Irving is an employer under the DCHRA and, at all times relevant in this case, was responsible for the employment decisions at issue in this litigation including retaliating against Ms. Maurad after she engaged in protected activity. Defendant Irving also aided and abetted Defendant Mark Bargas, Dave Watz and Earl McDermott in their unlawful conduct towards Ms. Maurad.

5. Defendant Mark Bargas (hereinafter Defendant "Bargas") is BSC's Vice President of Construction and Ms. Maurad's supervisor at BSC. Defendant Bargas subjected her to a hostile work environment and, at all times relevant to this lawsuit, acted within the scope of his authority. Defendant Bargas is an employer under the DCHRA and, along with Defendant Irving, was responsible for the employment decisions at issue in this litigation including retaliating against Ms. Maurad after she engaged in protected activity. Defendant Bargas aided and abetted Defendant Irving, David Watz and Earl McDermott's unlawful conduct toward Plaintiff, as described herein.

## JURISDICTION

6. This Court has original jurisdiction to adjudicate the claims asserted in this Complaint pursuant to 28 USC § 1331 because it includes claims under federal law. The Court has supplemental jurisdiction over the DCHRA claims under 28 USC § 1367.

## STATEMENT OF FACTS
### Plaintiff Begins Work at BSC and is Immediately Harassed

7. Ms. Maurad was hired by Defendant BSC in the fall of 2018 to serve as an Assistant Project Manager. She is a highly skilled construction professional with over eighteen years of experience in her field. Ms. Maurad began her career in construction as a laborer and worked her way up into the management structure of several construction companies prior to arriving at BSC.

8. From October of 2018 until January of 2019 Ms. Maurad was assigned to work on BSC's Downtown Day Center Project ("DDC Project"), a construction project to create a space for the city's homeless population that was funded by D.C.'s Department of Human Services.

9. From the beginning of Plaintiff's employment with BSC, she was subjected to a barrage of harassment from her supervisors and coworkers based on her failure to conform to gender stereotypes. Plaintiff dresses in a manner befitting someone who spends the workday on a construction site, wearing boots, work pants, and t-shirts. She does not "dress up" for work in a traditionally or stereotypically "feminine" manner, which may include wearing makeup, having her nails done, and spending a significant amount of time styling her hair.

10. While working as an assistant project manager at the DDC Project site in October of 2018, Plaintiff was repeatedly told by Defendant Bargas, BSC's Vice President of Construction, that she was not "feminine enough" and needed to start dressing and acting "more like a lady." He also

told her that she was too aggressive and that women are supposed to be more "soft spoken and gentle."

11. Defendant Bargas was also blatantly hostile towards Ms. Maurad based on her gender. For example, in November of 2018, Plaintiff attended a meeting with various stakeholders of the DDC Project, including the following: Jasmine Powers from the New York Avenue Presbyterian Church (NYAPC) where the Day Center is located, Alice Tewell (NYAPC), David Smoot (NYAPC), Matt Armstrong (Orr Partners), Federico Olivera-Sala (Moya Design Partners), Roger Gench (NYAPC), Rebecca Davis (NYAPC), Linda Kauffman (DC Bid (an association of D.C. business districts)), Wanda Sherrod (a Project Manager with BSC) and Defendant Bargas. Twice during the course of this meeting Mr. Bargas reached across the table while Plaintiff was speaking with Matt Armstrong and put the palm of his hand in Plaintiff's face to stop her from talking. Plaintiff stated, "I guess my presence is no longer necessary in this meeting." Bargas agreed. Plaintiff left the meeting out of frustration and humiliation.

12. Following this conversation, Plaintiff called Defendant Irving. Ms. Maurad described Defendant Bargas's behavior in the meeting and said that his behavior was unacceptable and unprofessional. She also told Irving about Bargas's many comments about her needing to be more "ladylike" and explained to him that Bargas was engaging in gender discrimination and harassment. Mr. Irving seemed unconcerned but indicated that he would speak to Bargas about his behavior.

13. Sometime after Ms. Maurad's phone call with Defendant Irving, Defendant Bargas approached Plaintiff in front of others and said only, "*I was told* that I owe you an apology."

14. After another Stakeholder's meeting in December 2018, while Ms. Maurad and Bargas were walking the site together, Bargas stated, "Erin, you know if you are going to succeed you really need to be more feminine and not so involved in your job." At that moment Ms. Maurad

4

asked Mr. Bargas if he would speak with her privately. She took him into the Lincoln Room at the church and said "Mark, we need to talk. Do you know what gender bias is?" Bargas laughed. Plaintiff nevertheless persisted and stated, "the comments that you make are highly inappropriate and illegal."

15. Bargas never suffered any consequences for his conduct toward Ms. Maurad. In fact, Irving aided and abetted Bargas's unlawful conduct and perpetuated Plaintiff's discriminatory treatment by directing other BSC employees to harass Ms. Maurad in a similar manner.

16. Also in November of 2018, Wanda Sherrod, a BSC Project Manager, called Plaintiff and told her, "Scottie [Defendant Irving] asked me to call you and speak to you about being more feminine and ladylike. You are too rough and aggressive; a woman doesn't act like that." Plaintiff was so shocked by the conversation that she placed the call on speaker for her superintendent on the Day Center Project, Billy Boswell, to hear. Plaintiff told Sherrod "thank you very much, you maybe need to go back to your documents regarding gender discrimination and maybe sexual harassment." Plaintiff's use of the term "documents" was in reference to BSC's policies and the applicable law prohibiting discrimination. Ms. Sherrod laughed in response.

17. Throughout the remainder of 2018 Ms. Sherrod continued to make negative comments to Plaintiff regarding Plaintiff's alleged lack of femininity and failure to conform to gender stereotypes.

18. Irving's failure to act on Ms. Maurad's complaints and his instructions to Sherrod to negatively comment on Plaintiff's appearance violated federal and D.C. law as well as BSC's own policies outlined in BSC's Employee Handbook, which states "[t]he Company will not tolerate conduct by any employee, subcontractor or client, which harasses, disrupts, or interferes with another's work or creates an offensive or hostile work environment. BLUE SKYE maintains a strict policy prohibiting sexual harassment and/or harassment because of race, religion, color,

national origin, ancestry, disability, medical condition, marital status, age, sexual orientation, or any other basis protected by federal, state, or local law."

19. Plaintiff was demoralized. Instead of improving her work environment, her complaints about Defendant Bargas's misconduct exacerbated the situation because Sherrod was now harassing her at the direction of Defendant Irving. In desperation, Plaintiff began having her nails done and applying make-up before work each day in an effort to avoid the harassment from Bargas, Sherrod and Irving.

### Plaintiff's Transfer to the Ward 6 Project

20. In January of 2019, Defendant Irving reassigned Ms. Maurad to BSC's Ward 6 Project, initially on a part-time basis, because the project was "in trouble" and they needed her help. The owner of the site/project is D.C.'s Department of Human Services and it designated the Department of General Services (DGS) as its representative on the project. DGS had sent BSC a letter in early January of 2019 accusing BSC of several violations including improper documentation and negligence. Irving instructed Plaintiff to audit the project and send him a report about her findings, which Plaintiff did after her first month on the site.

21. Plaintiff began working at the DDC Project from 6 am to 12 pm and the Ward 6 Project from 1 pm to 4 pm three (3) days a week. In March of 2019, she switched to working on the Ward 6 Project full time.

22. Shortly after becoming full-time on the Ward 6 Project, during a meeting with her new superintendent, David Watz, Sr., a Caucasian man in his 60s, Mr. Watz informed Plaintiff that they could not communicate via phone as she had done in the past with Mr. Boswell (her previous superintendent) as well as every other person she has ever worked for. He stated, that his "wife is extremely jealous and she will not allow it." Upon information and belief, if Plaintiff were a man, communicating with Watz via phone and text would not have been an issue. Additionally, upon

information and belief, Defendant Irving was aware of Watz's unwillingness to work with women prior to assigning Ms. Maurad to work on the Ward 6 Project.

23. Watz's bizarre demand that Plaintiff could not communicate with him based on her gender was not only discriminatory, it materially affected the terms and conditions of Plaintiff's employment because she could not effectively perform her duties. It was a significant burden for Ms. Maurad to have to search for Watz when she needed to communicate with him. And when she worked on site during the weekends and Watz was off, she had no way of communicating with him.

24. Watz also subjected Ms. Maurad to sexual harassment by attempting to touch her breasts and making repeat sexually explicit comments about her body to her. Defendant Watz's comments included, but were not limited to: (1) "ohh your boobs were looking really perky this morning;" (2) "ohh you must be wearing a different sports bra this morning because you got those pups tucked away;" (3) "get them big things out of the way;" (4) and "you must be cold this morning [I can tell] from your nipples;" and (5) "when are you going to let me see them [in reference to Plaintiff's breasts]." Mr. Watz would purposefully attempt to rub up against Plaintiff's breasts with his arm whenever he felt like he had an opportunity, for example, when he and Ms. Maurad were reviewing documents together or working in close proximity.

25. While Ms. Maurad was dealing with Watz's sexual harassment and blatant gender discrimination, she was also being harassed by her subordinate, Earl McDermott. As his supervisor, Plaintiff's job was to manage McDermott, counsel him when he made mistakes and provide feedback regarding his performance. In return, Mr. McDermott showed a complete lack of respect towards Plaintiff and engaged in frequent verbal altercations with her. McDermott told Ms. Maurad, "I don't have to listen to you, you cannot tell me what to do." McDermott also told Plaintiff that she was an "aggressive woman" and that he was a "chivalrous" man and he had issues working with aggressive women. Greg Prioleau, Senior Project Manager at Ward 6 and senior to

7

Plaintiff, and Mr. Watz witnessed McDermott's misconduct, but instead of disciplining him, Prioleau would tell Plaintiff to calm down. Plaintiff complained about McDermott's incompetence, insubordination and hostility to Watz, Prioleau and Defendant Irving on a regular basis, but they took no action.

26. Mr. Prioleau also routinely criticized Ms. Maurad for not conforming to gender stereotypes. He would say things like, "we all know you are smart and know your job [but] you are just too aggressive for a female." He also subjected Ms. Maurad to repeated meetings in his office to discuss how she was too aggressive and needed to be "softer" and more "feminine."

27. Mr. Prioleau also demeaned Plaintiff in front of others because of her gender. For example, he would "shush" Plaintiff at meetings, but never did this to her any of the male team members.

28. Instead of disciplining or terminating Mr. McDermott for his harassment and insubordination towards Plaintiff, in April 2019, Ms. Maurad's supervisor, Priloeau, instructed Plaintiff to work from home two days a week because Mr. McDermott did not want to work in her presence. For approximately six weeks, Ms. Maurad was demeaned and humiliated by having to stay at home just to make her male subordinate more comfortable at work. Her banishment finally ended when McDermott was terminated on May 21, 2019 for, upon information and belief, reasons unrelated to his mistreatment of Ms. Maurad.

29. Around the time that McDermott was terminated in May 2019, Greg Prioleau received a series of text messages from Watz's wife stating that it was inappropriate for BSC to require her husband to work with Ms. Maurad on the project because she is a woman and that her husband would not be able to work on the job site unless Ms. Maurad was removed from the project.

8

30. The week of June 9, 2019, Ms. Watz sent another barrage of text messages to Mr. Prioleau. She falsely claimed that Plaintiff had sent sexually explicit text messages to her husband. Without bothering to confirm whether or not this was true, Prioleau decided to remove Ms. Maurad from the site and told Ms. Maurad to report to BSC's corporate office the following Monday, where she had not worked since October of 2018, when she was first hired by BSC.

31. Within the next week, Greg Prioleau at the direction of Mr. Irving, informed Plaintiff that her hours would be changed from 6:00 am to 3:00 pm to 8:00 am to 4:30 pm and that she would need to work for home Monday, Wednesday and Friday to appease Mr. Watz and his wife.

32. Plaintiff told Mr. Prioleau that she should not be penalized for the irrational behavior of a coworker's wife. Plaintiff was distraught because there was absolutely no reason why she should be removed from the job site. She was also fearful that she would not be able to perform her duties if she was not on-site. She eventually convinced Prioleau and Irving to let her work on-site Monday, Wednesday and Friday and telework on Tuesdays and Thursdays. Prioleau refused to allow her to revert to her original hours.

33. Not being on site two days a week substantially affected Plaintiff's ability to perform her duties including supervising the subcontractors on the project. Moreover, both Watz and now Prioleau, refused to communicate with her when she was off site, which further exacerbated her ability to perform her job.

34. On or about June 18, 2019, Ms. Maurad was instructed by Irving and Prioleau to provide a statement regarding Ms. Watz's allegations against her as part of an alleged investigation by an attorney retained by BSC. Plaintiff was told that BSC's attorney would "resolve" the matter. Mr. Watz and Gil Valdez, another superintendent, were also asked to provide statements.

35. Plaintiff submitted her statement on or about June 22, 2019 to Mr. Prioleau and Defendant Irving. In her statement Plaintiff detailed the gender-based hostile work environment

9

she was subjected to on a daily basis during her tenure with BSC, including her mistreatment while working on the Ward 6 Project. She wrote, in part,

> Since my inception at Blue Skye I have been repeatedly met with gender bias and sexual discrimination…I was repeatedly told by upper management [ ] that I did not dress feminine enough, that I need to wear makeup to work and wear "girl" clothes. On this same matter[,] a female superior approached me and stated that they were instructed to speak with me by the owner about my acting an dressing more feminine.
> …
> This same Superintendent makes continuous comments about my breasts on the daily and has made numerous other sexual innuendos towards me on a daily basis. This is something that I realize now that I should have reported but past experience has caused me to feel that no action would have been taken. I have been the one that has been "penalized" by having my work hours on site altered because of the marital issues of a coworker, rather than the coworker being asked to keep their personal issues off the site.
>
> As part of my daily routine on the site I am continuously and constantly subjected to a barrage of sexual harassment and degrading remarks not only from my own team but the same behavior is encouraged in our sub[contractors] as well…[O]ne of our Superintendent's continually chooses to tell subs and foreman not to speak to me because I am incompetent and I am only a secretary which is completely degrading and humiliating to my competency and capability…
> …
> [ ] I have brought previous matters to BSC management and no action was ever taken or my concerns were minimized or I was told I was being too "aggressive or hard for a woman" it is not a conducive environment for me to believe that even if I had said something that any action would have been taken.

36. Plaintiff concluded her letter by stating "I am a team player and will always give my all for my employer and the good of the project, all I ask is that I be allowed to do my job without harassment, interference from outside personal issues of coworkers, and in a structured environment. All I want is to be able to do my job that I was hired for to the best of my capabilities. This entire situation has had a profound [e]ffect on not only my ability to do my job, but has caused undo stress in addition to the already stressful job that we do."

10

**Plaintiff is Subjected to Further Retaliation and Harassment**

37. Plaintiff was never contacted by any attorney to follow up on the statement she provided. In fact, after she provided her statement, she was retaliated against and subjected to additional harassment based on her gender.

38. Plaintiff was purposefully excluded from team meetings, access to information necessary to perform her duties, organized social events and is still prohibited from working on Saturdays, unlike her male colleagues.

39. For example, regarding being excluded from meetings, every morning Watz, Prioleau, and Valdez (another Superintendent) held a meeting to discuss the status of the Ward 6 Project and the day's tasks. After Ms. Maurad submitted her statement to BSC's leadership in June, Plaintiff was excluded from these team meetings even though she is integral part of the project's leadership team and the issues discussed (and decisions made) at these meetings directly impacted her job. Interestingly, the daily morning meetings were instituted and led by Plaintiff to remedy communication issues on the site. After she submitted her statement, Watz, Prioleau, and Valdez employed extreme measures to exclude Ms. Maurad, including barricading themselves in Prioleau's office by propping up a chair in front of Prioleau's door. When Plaintiff asked Prioleau why she was excluded from these meetings, he replied that it was she who "didn't want to be part of the team."

40. Watz routinely referred to Ms. Maurad as a "bitch" or a "fucking bitch" and told her to "shut up" without repercussions. For example, on July 3, 2019, Watz called Prioleau and placed him on speakerphone in the presence of Ms. Maurad. Watz told Prioleau, "Do you know what that bitch did? She sent the [Porta-John] guy away and we have all of those people coming to the site tomorrow." Ms. Maurad tried to explain that the Porta-John representative could not access the Porta-Johns and asked if he could come the day after the 4th of July holiday to service them. Plaintiff said that it would be okay to do so because no one would be on-site for the 4th of July

11

holiday. This was incorrect because Prioleau had invited all of the managers and their families, except for Ms. Maurad, to watch the fireworks from the site which is apparently why Watz was disparaging Maurad's decision to allow the Porta-John company to leave without servicing the Porta-Johns.

41. Watz, Prioleau, and Valdez refused to respond to Plaintiff's emails and texts. For example, Plaintiff was responsible for preparing the agenda for the weekly Owner Architect Contractor (OAC) meetings with BSC, the Department of Human Services, and Studio 27 (the project's architects). To create these agendas, Plaintiff needed a current schedule and a "three-week look ahead" from Watz, which details the work to be performed on the project during the three weeks following the meeting. After Plaintiff submitted her statement in June, Watz refused to provide Plaintiff with the "look ahead" which caused Ms. Maurad to create the agenda without this crucial information.

42. Watz and Prioleau routinely disparaged and humiliated Ms. Maurad during the weekly OAC meetings. Both men routinely interrupted her when she spoke, questioned her competency in front of the group, and excluded her from the conversation, even though Plaintiff was tasked with running the meeting.

43. On July 17, 2019 Mr. Prioleau closed the worksite for the day several hours early due to excessive heat but purposefully did not inform Ms. Maurad. Several hours later, Greg Mixon, Labor Foreman, came to her office and asked her why she was still at the site because it had been shut down several hours prior. When Plaintiff asked Prioleau regarding why he did not inform her of the closure, he said that because she sits in her office with the door closed, that she did not want to be part of the team, thus he felt no need to inform her of the site closure.

44. On July 18, 2019 Plaintiff was on site at the request of Mr. Irving to meet with Shawn Samuel from JDC (the third party contracted by DGS to provide on-site project

management), regarding the project. Mr. Samuel came to the site trailer and asked Plaintiff to sit down and go over the schedule and project status with him. During the meeting Prioleau came out of his office, sat down at the table, and began to baselessly contradict Plaintiff, tell Mr. Samuel that maybe Valdez needed to speak to him instead of Plaintiff. That same day Plaintiff was approached by Watz and told that she was to incompetent to oversee Saturday work.

45. On August 5, 2019, while Ms. Maurad was attempting to obtain vital information about the project from Watz, Greg Mixon told Plaintiff, "I don't know why you are even talking [because] no one here even listens to you."

46. On August 6, 2019 Prioleau, Watz, Wimbush, and Valdez held a call with the project's scheduler in Prioleau's office and Prioleau intentionally shut the door and excluded Plaintiff. That same day Marcus Brummer from JDC told Plaintiff that Greg Prioleau came into his office and stated "you can have her [in reference to Plaintiff]. We will do like an NBA trade and BSC will pay you to take her."

47. In response to Prioleau's continued efforts to exclude and marginalize her, Plaintiff wrote an email on August 6, 2019 to Irving and George Mavrikes (Defendant's Managing Partner) stating the following:

> I have previously spoken to you on many occasions about my treatment by my team members at Ward 6, including the statement that you requested and you have stated that you would address it. However, the situation has not gotten better in fact it has gotten worse. . . . . Case in point, Greg had a conference call today with the scheduler, had Kenny, Gil and Dave in his office and shut the door, intentionally excluding me . . . . This type of behavior goes on all day long from the three of them, not only is it childish and immature and unprofessional, it is discriminatory and vindictive behavior . . . . . Of all my experience of doing this, [I] have never been treated so poorly. This has been going for months even resulting in me being falsely accused of sexual harassment which you promised to have your lawyer address and no action has been taken to resolve or find remediation to the problem other than my hours and access to the site being restricted. I do not understand why I continue to be victimized and penalized by Greg, Gil and Dave who have now circled their wagons against me. I am asking

13

>   once again, no I implore you to remove me from this site an put me back with Billy [Boswell] where I feel safe and can efficiently and productively do my job to the best of my ability for Blue Skye.

Nothing was done in response to Plaintiff's email.

48. On August 7, 2019, Plaintiff was in her office with Marcus Brummer discussing project finances when they overheard Watz outside the trailer screaming "I told that fucking bitch not to talk to Marcus." When Mr. Brummer went out to question Watz about his statement, Watz initially denied it, but then repeated to Brummer, "I told that bitch not to talk to you." When Brummer asked him why he would say that, Dave responded "because I am her boss and she is to do exactly what I say."

49. As of August 12, 2019, BSC's offices at Ward 6 were scheduled to be moved into the basement of the building because the trailer that housed their offices had to be moved to allow the area to be landscaped. Without any warning, Ms. Maurad arrived to work to find that that her desk, chair, and work items were missing. She soon found out that all of her belongings had been removed and placed in the basement area a week prior than what was necessary on the orders of Watz. Also, at the request of Watz, Mixon placed Plaintiff's work area approximately two hundred feet away from the other employees. Watz also removed a fan that Plaintiff was using to cool her portion of the unventilated and un-airconditioned basement.

50. Ms. Maurad continues to face harassment based on her sex and retaliation based on her protected activity from her supervisors and coworkers. She is plagued by anxiety due to her work environment and must go to the work site each day fearing additional acts of retaliation and harassment. Though Plaintiff ordinarily derives great satisfaction from her work she now feels depressed, hopeless and powerless.

51.     Plaintiff has repeatedly and continues to request that she be moved a new project, away from the harassment and retaliation.  To this day, Irving has refused but the mistreatment continues.

## COUNT I:
### Hostile Work Environment Based on Gender in Violation of Title VII
### Against Defendant BSC

52.     Plaintiff incorporates the paragraphs above as if specifically set forth herein.

53.     Title VII prohibits employers from discriminating "against any individual…because of such individual's…sex" 42 U.S.C. § 2000e-2(a)(1).  Sex discrimination includes creating a hostile or abusive work environment if the harassment is sufficiently abusive to affect a term, condition or privilege of employment.

54.     Ms. Maurad is a member of a protected class: female.  As described in detail in this Complaint, Ms. Maurad was subjected to unwelcome sexual harassment, which was based on her gender.  The sexual harassment includes, but is not limited to, harassing Ms. Maurad for not conforming to gender stereotypes, subjecting her to sexually explicit comments about her body and unwelcome sexual advances, changing her work hours and excluding her from the worksite based on Ms. Maurad's subordinate's complaints about working with a female, changing her work hours and excluding her from the worksite based on Watz's wife's complaints regarding her husband working with a female, demeaning and insulting treatment, and excluding Ms. Maurad from access to information and meetings that were necessary in order for her to perform the duties of her position.

55.     The harassment had the effect of unreasonably interfering with Plaintiff's work performance and created an intimidating, hostile and offensive work environment.

56.     At all relevant times, the supervisors who subjected Ms. Maurad to harassment, including Irving, Bargas, Watz, Prioleau and Sherrod were acting within the scope of their authority and as agents of BSC.

## COUNT II:
## Hostile Work Environment Based on Gender in Violation of the D.C. Human Rights Act
## <u>Against All Defendants</u>

57. Plaintiff incorporates the paragraphs above as if specifically set forth herein.

58. Defendants Irving, Bargas and BSC are "employers" as defined by the D.C. Human Rights Act §§ 2-1401.02 (10).

59. Under the D.C. Human Rights Act it is unlawful for an employer to discriminate against employees based on sex, including to subject them to a hostile work environment. *See* D.C. Code § 2-1402.11(a).

60. Ms. Maurad is a member of a protected class: female. As described in detail in this Complaint, Ms. Maurad was subjected to unwelcome sexual harassment, which was based on her gender. The sexual harassment includes, but is not limited to, harassing Ms. Maurad for not conforming to gender stereotypes, subjecting her to sexually explicit comments about her body and unwelcome sexual advances, changing her work hours and excluding her from the worksite based on Ms. Maurad's subordinate's complaints about working with a female, changing her work hours and excluding her from the worksite based on Watz's wife's complaints regarding her husband working with a female, demeaning and insulting treatment, and excluding Ms. Maurad from access to information and meetings that were necessary in order for her to perform the duties of her position.

61. Defendant's harassment of Plaintiff based on sex was sufficiently severe and pervasive as to change the terms and conditions of Plaintiff's employment.

62. Defendant's conduct caused Plaintiff emotional pain and suffering.

63. Defendant's conduct was willful and malicious such that Plaintiff is entitled to punitive damages under D.C. Code § 2-1403.16.

## COUNT III:
### Retaliation in Violation of the D.C. Human Rights Act
### Against All Defendants

64. Plaintiff incorporates the paragraphs above as if specifically set forth herein.

65. Defendants Irving, Bargas and BSC are "employers" as defined by the D.C. Human Rights Act §§ 2-1401.02 (10).

66. Under the D.C. Human Rights Act it is unlawful for an employer to retaliate against an employee based on that person's protected activity. *See* D.C. Code § 2-1402.61.

67. Plaintiff engaged in protected activity by complaining to her supervisors (including Irving, Bargas, and Prioleau) about the discrimination and harassment she faced.

68. Due to Plaintiff's protected activity, Defendants took adverse employment actions against Plaintiff, including removing her from the worksite, limiting and altering her normal work hours, excluding her from meetings and limiting her access to information, which made it virtually impossible for Plaintiff to accomplish her duties.

69. Defendants' unlawful conduct would deter a reasonable employee from engaging in further protected activity.

70. Defendants' unlawful conduct caused Plaintiff emotional pain and suffering.

71. Defendants' unlawful conduct was willful and malicious such that Plaintiff is entitled to punitive damages under D.C. Code § 2-1403.16.

### PRAYER FOR RELIEF

WHEREFORE, Ms. Maurad respectfully prays that this Court enter judgment against Defendants as follows:

a) enter a declaratory judgement finding that Defendants violated D.C. Code § 2-1401.01, *et seq.*;

b)  enter a permanent injunction directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

c)  award compensatory damages pursuant to the DCHRA and Title VII in an amount to be determined by the jury that would fully compensate Plaintiff for the humiliation, embarrassment, and mental and emotional distress caused by the conduct of Defendants as alleged herein;

d)  award punitive damages to Plaintiff pursuant to the DCHRA in an amount to be determined by the jury that would punish Defendants for its willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

e)  award Plaintiff reasonable attorneys' fees and costs incurred in this action;

f)  order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

/s/ Sundeep Hora
Sundeep Hora (D.C. Bar. No. 472944)
Savanna L. Shuntich (D.C. Bar. No 1034411)
ALDERMAN, DEVORSETZ & HORA PLLC
1025 Connecticut Ave., NW
Suite 615
Washington, D.C. 20036
Tel. 202.969.8220
Fax 202.969.8224
E-mail: shora@adhlawfirm.com

*Attorneys for Plaintiff*